UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOSEPH L. BOCK, as Personal Representative of the Estate of Paula Garcia Franks,<br><br>Plaintiff,<br><br>v.<br><br>DAIMLER TRUCKS NORTH AMERICA LLC, et al,<br><br>Defendants. | ) | Civil No. 3:24-cv-30099-MGM |

MEMORANDUM AND ORDER ON PLAINTIFF'S UNRESOLVED REQUEST FOR LEAVE TO ADD A CHAPTER 93A CLAIM AGAINST DTNA

MORGAN, U.S.M.J.

Joseph L. Bock ("Plaintiff") brings this case as Personal Representative of the Estate of Paula Garcia Franks, his wife, who tragically died from injuries she sustained when the motor vehicle in which she was riding was struck from behind by a Freightliner Corporation, predecessor in interest to the defendant Daimler Truck North America LLC ("DTNA"), truck. Before the court is Plaintiff's timely request pursuant to Fed. R. Civ. P. 15 seeking leave to add a claim against DTNA for violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A ("Chapter 93A") (Dkt. No. 122). DTNA opposes the amendment on futility grounds (Dkt. Nos. 126, 172). For the reasons set forth herein, Plaintiff's request for leave is ALLOWED, and Plaintiff is directed to file his third amended complaint in

the form attached to his motion (Dkt. No. 122-3, although he may substitute "Third" for "Second" in the title), within ten days of this order.[1]

I. Factual Allegations

On January 9, 2024, Paula Garcia Franks ("Garcia Franks") was a backseat passenger in a vehicle being driven by Weihua Zou ("Zou") pursuant to a contract between Plaintiff and Elife Tech, Inc. ("Elife Tech"), Jayride Group Limited ("Jayride Group"), Bluesky Travel LLC ("Bluesky Travel"), and Zihan Gao ("Gao") to transport Garcia Franks from John F. Kennedy Airport in New York to the home she shared with Plaintiff, her husband, in Easthampton, Massachusetts (Dkt. No. 127, at ¶¶ 139-141). While en route on Interstate 91 North in Connecticut, the vehicle in which Garcia Franks was riding began to decelerate for unknown reasons and was struck from behind by a 2024 Freightliner Cascadia semi-truck driven by the defendant Odner Chevalier ("Chevalier") (*id.* at ¶¶ 142-48). According to Plaintiff, despite DTNA's development of the "Detroit Assurance" safety system designed to mitigate against, reduce the severity of, and potentially avoid collisions with other vehicles via an alert system and automated braking, the subject truck did not contain any kind of collision mitigation safety system (*id.* at ¶¶ 173, 191-97).

[1] This court follows the practice of other courts in this circuit to issue a report and recommendation only where it concludes that allowing amendment as to a proposed new claim would be futile, which would have the effect of ending the claim. *Carrabes v. Expeditors Int'l of Washington, Inc.*, Civil Action No. 24-12142-AK, 2025 WL 2409840, at *1 n.1 (D. Mass. June 12, 2025) (citing *Sargent v. NorDx*, Civil Action No. 2:20-cv-00467-JAW, 2022 WL 17738711, at *4-5 (D. Me. Dec. 16, 2022)), *report and recommendation adopted,* No. 1:24-CV-12142, 2024 WL 6475950 (D. Mass. Aug. 1, 2025).

## II. Procedural History

On August 14, 2024, Plaintiff filed the instant lawsuit against DTNA, Elife Tech, Zou, and Chevalier, as well as ASAP Logistics, LP ("ASAP"), and Ester Cargo, Inc. ("Ester Cargo") (Dkt. No. 1), followed by an amended complaint filed as of right on October 23, 2024, which added as a defendant Jayride Group (Dkt. No. 17). Plaintiff's claims against DTNA included a count for breach of implied warranty of merchantability, Mass. Gen. Laws ch. 106, § 2-314. As alleged by Plaintiff, DTNA "warranted that the [subject] truck was of good and merchantable quality, fit, safe, not defective or unreasonably dangerous, and in proper condition for the ordinary use for which [it] was designed and intended to be used" (*id.* at ¶ 156). However, Plaintiff claims that DTNA breached those implied warranties because the subject truck lacked a safety system, such as DTNA's proprietary Detroit Assurance, that could have provided an audible alarm with a visual warning if it got too close to another vehicle, followed by partial braking, and full active braking as necessary, rendering the truck unreasonably dangerous and unsafe for its intended use (*id.* at ¶¶ 157, 158a, 158c, 158h). Plaintiff also charges that DTNA "fail[ed] to properly weigh the risks, benefits, and utility of th[e] safety technology," when it "chose to design, manufacture, and sell the subject truck without Detroit Assurance or any other similar safety systems," despite its knowledge that human error is responsible for approximately 94% of crashes and that inclusion of the safety system could "mitigate against, reduce the severity of, and potentially avoid collisions with other vehicles on the roadway . . . dramatically outweigh[ing] any risks and/or costs" (*id.*

at ¶¶ 158b, 158d, 158e). In addition to his claim for breach of the implied warranty of merchantability, Plaintiff also brings claims against DTNA for negligence, gross negligence, conscious pain and suffering, and wrongful death (*id.* at ¶¶ 162-182). DTNA answered Plaintiff's original and amended complaints (Dkt. Nos. 7, 24).

The court entered a scheduling order on February 4, 2025, setting a deadline for amended pleadings of October 31, 2025 (Dkt. No. 56). Plaintiff filed an assented-to motion to extend the deadline to July 31, 2026, which the court granted on October 10, 2025 (Dkt. Nos. 110-112). On December 16, 2025, Plaintiff sought leave to file a second amended complaint adding as defendants GBT Bluesky Travel LLC and Zihan Gao, who Plaintiff alleges partnered with Elife Tech to offer ground transportation, and Tampa Truck Center LLC, who Plaintiff alleges was engaged in the business of selling Freightliner semi-trucks and introduced the semi-truck involved in the instant collision into the stream of commerce, as well as to correct his misnaming of one defendant as Chevalier Odner to Odner Chevalier (Dkt. No. 122). All existing defendants assented to these changes, so Plaintiff filed a second amended complaint incorporating them (Dkt. No 127), and the District Judge to whom the case is assigned found Plaintiff's motion for leave to amend moot (Dkt. No. 163). However, Plaintiff also seeks to add a Chapter 93A claim against DTNA (Dkt. No. 122), to which DTNA objects (Dkt. Nos. 126, 172). Therefore, Plaintiff must yet obtain leave to add it. *See* Fed. R. Civ. P. 15(a)(2) (amendments other than those that can be made as a matter of course pursuant to Rule 15(a)(1) may be made "only with the opposing party's written consent or the court's leave").

## III. Legal Standard

After the defendant has filed a responsive pleading, a plaintiff must have the permission of the court or consent of the opposing party to amend a complaint. *Stier v. Girl Scouts of the USA*, 383 F.3d 7, 12 (1st Cir. 2004). "The default rule mandates that leave to amend is to be 'freely given when justice so requires,' unless the amendment 'would be futile, or reward, *inter alia*, undue or intended delay.'" *Id.* (quoting Fed. R. Civ. P. 15(a) and *Resolution Tr. Corp. v. Gold*, 30 F.3d 251, 253 (1st Cir. 1994)). "If leave to amend is sought before discovery is complete and neither party has moved for summary judgment, the accuracy of the 'futility' label is gauged by reference to the liberal criteria of Federal Rule of Civil Procedure 12(b)(6)." *Hatch v. Dep't for Children, Youth & Their Families*, 274 F.3d 12, 19 (1st Cir. 2001) (citing *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996)). To survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss, a "complaint must contain enough factual material to raise a right to relief above the speculative level . . . and state a facially plausible legal claim," *Guerra-Delgado v. Popular, Inc.*, 774 F.3d 776, 780 (1st Cir. 2014) (quoting *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011)), "accept[ing] as true all well-pleaded facts in the complaint and draw[ing] all reasonable inferences in the pleader's favor." *Id.* (citing *Tasker v. DHL Ret. Sav. Plan*, 621 F.3d 34, 38 (1st Cir. 2010)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## IV. Discussion

The Massachusetts Consumer Protection Act declares unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2. Plaintiff alleges that DTNA violated the provisions of the consumer protection statute by breaching the implied warranty of merchantability. DTNA does not dispute that "[g]enerally, a breach of warranty constitutes a violation of [Chapter 93A]," *Maillet v. ATF-Davidson Co., Inc.*, 552 N.E.2d 95, 100 (Mass. 1990) (collecting cases), nor that, pursuant to regulations promulgated by the Attorney General, such breach includes "fail[ing] to perform or fulfill any promises or obligations arising under a warranty," including the implied warranty of merchantability. *Id.* (quoting 940 Code Mass. Regs. § 3.08(2) (1986)) (citing 940 Code Mass. Regs. § 3.01 (1986)).

"The implied warranty of merchantability requires that goods be 'fit for the ordinary purposes for which such goods are used.'" *Liberty Mut. Ins. Co. v. Broan-NuTone LLC*, 731 F. Supp. 3d 205, 218 (D. Mass. 2024) (quoting Mass. Gen. Laws ch. 106, § 2–314). "A seller breaches its warranty obligation when a product that is 'defective and unreasonably dangerous' . . . for the '[o]rdinary purposes' for which it is 'fit' causes injury." *Haglund v. Philip Morris, Inc.*, 847 N.E.2d 315, 322 (Mass. 2006) (second alteration in original) (quoting *Colter v. Barber–Greene Co.*, 525 N.E.2d 1305, 1314 (Mass. 1988); *Back v. Wickes Corp.*, 378 N.E.2d 964, 969 (Mass. 1978)). The Supreme Judicial Court of Massachusetts has interpreted the meaning of both "ordinary purposes" and "fitness" as used in the statute. "Ordinary purposes" encompasses "both those uses which the manufacturer intended and

those which are reasonably foreseeable." *Back*, 378 N.E.2d at 969. "'Fitness' is a question of degree that primarily, although not exclusively, concerns reasonable consumer expectations." *Haglund,* 847 N.E.2d at 322 (citing *Back*, 378 N.E.2d at 970). The determination of a product's fitness also requires "weigh[ing] multiple factors, including 'the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.'" *Id.* (quoting *Back*, 378 N.E.2d at 970).

"To prevail on a breach of warranty claim, the plaintiff must show '(1) that the defendant manufactured or sold the product; (2) that a defect or unreasonably dangerous condition existed at the time the product left the defendant's hands so that it was not reasonably suitable for the ordinary uses for which goods of that kind were sold; (3) that at the time of his injury, the plaintiff was using the product in a manner that the defendant intended or that could reasonably have been foreseen; and (4) that the defect or unreasonably defective condition . . . was a legal cause of the plaintiff's injury.'" *Alves v. Mazda Motor of Am., Inc.*, 448 F. Supp. 2d 285, 300 (D. Mass. 2006) (quoting *Lally v. Volkswagen Aktiengesellschaft*, 698 N.E.2d 28, 43 (Mass. App. Ct. 1998)). DTNA's futility argument challenges the second and fourth elements. According to DTNA, Plaintiff cannot state an implied warranty claim because the absence of collision mitigation technology in the subject truck did not render it unreasonably dangerous as a matter of law, and Plaintiff's

allegations that collision mitigation technology could have prevented the accident or mitigated the decedent's injuries is entirely speculative, where the involved vehicles are in possession of the Connecticut State Police and have not been made available for inspection and where no depositions have been taken.

In asking this court to find that the subject Freightliner Cascadia was not unreasonably dangerous as a matter of law based on the omission of a collision mitigation system, DTNA relies on several decisions from other jurisdictions that DTNA says "have held that the absence of an added safety device does not, by itself, render a product unreasonably dangerous," including a case brought against DTNA in Kansas (Dkt. No. 126, at 4-6). Plaintiff counters that whether the lack of an optional safety feature renders a motor vehicle unreasonably dangerous is a question for the jury. The court finds that Plaintiff has the better of the argument.

Each of the decisions DTNA cites in support of its futility argument fail to offer the level of support DTNA claims. Plaintiff first cites *Davis v. Caterpillar Tractor Co.*, 719 P.2d 324, 327 (Colo. Ct. App. 1985), which is distinguishable on its facts. In *Davis*, the Colorado Court of Appeals reversed a judgment entered against the defendant tractor manufacturer following a jury verdict on the plaintiff's strict products liability claim. *Id.* at 325. The plaintiff, who was rendered a quadriplegic when a tree fell across the tractor he had purchased from the defendant, alleged that the tractor was defectively designed by virtue of not having an overhead protective structure, notwithstanding evidence that he chose to purchase the tractor without this added safety feature. *Id.* at 325-326. The *Davis* court acknowledged

that "failure to provide safety devices can be the basis of a design defect in strict liability based upon the Restatement (Second) of Torts § 402A (1965)," but "a product is not 'unreasonably dangerous' and, thus, defectively designed if the consumer deliberately chooses to purchase that which he, as a reasonable consumer, should have expected was not as safe as other products on the market." *Id.* at 326-27 (citations omitted). The court found that the latter principle controlled where the tractor model in question was "used in a myriad of different jobs and in a number of different environs," and had "some ninety different options designed to enhance the tractor's safety and utility within the specific context of the purchaser's needs." *Id.* at 327. The court reasoned that the "plaintiff was in the best position to evaluate and eliminate the danger by purchasing an overhead protective safety option, [and] he should accordingly bear the loss resulting from his failure to do so." *Id.* (citation omitted).

Yet, in *Davis*, "the [plaintiff] was . . . the person who made the decision to purchase the product, was aware of and had the option to purchase the overhead safety feature, and made the informed choice to purchase the more dangerous model." *McHargue v. Stokes Div. of Pennwalt*, 686 F. Supp. 1428, 1441 n.16 (D. Colo. 1988) (distinguishing *Davis* and denying summary judgment to the defendant manufacturer where, as here, the injured party was not the purchaser). "Thus, the broad holding of [*Davis*] . . . is that a manufacturer is not liable to a *purchaser* when the former provides a range of choices with varying degrees of safety, but the purchaser fails to establish that the particular model chosen is unreasonably

dangerous.” *Id. Davis* “do[es] not stand for the proposition that evidence of alternative designs is insufficient to support a finding that the design in question is defective.” *Id. See also id.* at 1441-42 (noting that “expert testimony describing a number of safety features that would have prevented the accident, all of which [we]re technologically and economically feasible, and many of which were . . . in common use when [the subject machine] was manufactured,” if “present[ed] at trial[,] would be sufficient to sustain a finding by the jury that the design at issue was indeed defective”). So distinguished, *Davis* provides no support for DTNA’s request that the court find the 2024 Freightliner Cascadia not unreasonably dangerous as a matter of law.

Plaintiff next cites *Curtis v. Gen. Motors Corp.*, 649 F.2d 808 (10th Cir. 1981), in which the Tenth Circuit, also applying Colorado law, reversed a judgment entered for the plaintiff on a strict products liability claim against the defendant car manufacturer. *Id.* at 809. The plaintiff, who sustained injuries in a single car accident, alleged that the car—a Chevrolet Blazer with off-road capability, four-wheel drive, and a removable fiberglass top—was defective and unreasonably dangerous because it failed to provide adequate rollover protection. *Id.* at 809-11. The Tenth Circuit declined to find the car not defective as a matter of law as the defendant had requested, instead remanding for a new trial and directing that the jury be instructed to consider the reasonableness of the “relative degrees of danger” of the removable fiberglass top as a necessary trade-off for the special purpose vehicle as compared to the safest steel top option. *Id.* at 810-12. Thus,

notwithstanding DTNA's reliance on the decision, *Curtis* supports Plaintiff's position that the unreasonably dangerous determination belongs to the jury.

The remaining cases DTNA cites involve the application of a different standard of liability. "Massachusetts has moved away from the consumer expectations test and adopted a risk-utility approach to defective product claims . . . ." *Ducat v. Ethicon, Inc.*, 534 F. Supp. 3d 152, 157 (D. Mass. 2021). "While consumer expectations may be considered in the risk-utility balancing, . . . 'consumer expectations do not play a determinative role in determining defectiveness.'" *Evans v. Lorillard Tobacco Co.*, 990 N.E.2d 997, 1012 (Mass. 2013) (quoting Restatement (Third) of Torts: Prods. Liab. § 2 cmt. g (1998)). "Under th[e] standard as applied in Massachusetts, whether a product is unreasonably dangerous depends on many factors, including the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design." *Ducat*, 534 F. Supp. 3d at 157 (quoting *Evans*, 990 N.E.2d at 1013) (internal quotation punctuation omitted). "To establish a prima facie case of defect, the plaintiff must prove the availability of a technologically feasible and practical alternative design that would have reduced or prevented the plaintiff's harm." *Evans*, 990 N.E.2d at 1014 (quoting Restatement (Third) of Torts: Prods. Liab. § 2 cmt. f (1998)). "[U]nder Massachusetts law, the reasonable expectations of the ordinary consumer [do not] constitute the sole, determinative factor in

determining liability for a breach of the implied warranty of merchantability based on defective design." *Id.* The remaining cases cited by DTNA applied either the consumer expectations test, which Massachusetts courts no longer strictly employ, or a hybrid of it, and thus, are unavailing to DTNA's futility claim.

In *Butler v. Daimler Trucks North America, LLC*, Case No. 19-CV-2377-JAR, 2022 WL 2191755 (D. Kan. June 16, 2022), the court granted summary judgment to DTNA on the plaintiffs' products liability theories relative to a 2015 Freightliner Cascadia involved in a fatal accident, reasoning that the purchaser of the truck made an intentional decision not to equip the subject Freightliner with available collision mitigation technology. *Id.* at *3. Employing the consumer expectations test utilized by Kansas courts, the *Butler* court concluded that DTNA was entitled to summary judgment because the plaintiffs did not allege that the lack of forward collision warning or automatic emergency braking technology in 2014, when the Freightliner in question was sold, rendered it "incapable of being operated by an attentive driver, of being operated at a proper speed and at a safe distance from other vehicles, or of being slowed or stopped with air brakes engaged by the driver," even if the addition of the collision mitigation systems could have prevented or mitigated the accident. *Id.* at *12. Application of the same test under Oklahoma law in *Youngberg v. Gen. Motors LLC*, Case No. 20-339-JWB, 2022 WL 3925272 (E.D. Okla. Aug. 24, 2022), led to the same result. The *Youngberg* court granted summary judgment to the defendant on the plaintiff's product liability claim on the ground that the "[p]laintiff cite[d] no evidence that a significant shift in consumer

expectations or reliance upon automated warning or braking systems had taken place by 2013 [when the subject van was sold] or that the danger posed by operating the 2013 van was otherwise beyond the contemplation of ordinary users." *Id.* at *4. The *Youngberg* court explicitly noted the lack of any "sign that Oklahoma has backed away from the consumer expectation test"; therefore, the risk-utility test, which "identifies unreasonably dangerous products (in part) by assessing whether feasible alternative designs exist that could have prevented the injuries," meant that "the fact that such designs existed is insufficient to support a finding that th[e] product was unreasonably dangerous." *Id.* at *5 (quoting and citing *Braswell v. Cincinnati Inc.*, 731 F.3d 1081, 1088-89 (10th Cir. 2013)). This is patently not the case in Massachusetts.

In *Berkoski v. Honda Motor Co., Ltd.*, 328 A.3d 986 (N.J. Super. Ct. App. Div. 2025), the Appellate Division of the Superior Court of New Jersey affirmed summary judgment for the defendant on the plaintiff's design defect claim premised on the subject vehicle not being equipped with lane drift warning and lane keeping assist technology. *Id.* at 987-88. The court held that the plaintiff was not entitled to present his case to a jury where the vehicle was "reasonably safe" as a matter of law because it was "understood that the safe operation of a motor vehicle [manufactured in 2016 and equipped with then-existing technologies wa]s dependent on the driver's diligence in steering the vehicle and using the vehicle's systems to control speed and braking." *Id.* at 993. The court explained that the New Jersey Products Liability Act "adopts the 'consumer expectations' test and is really

a 'hybrid' . . . that combines the 'consumer expectations' doctrine for determining whether a product is defective with the obvious-danger factor of the risk-utility analysis to create a defense to a design-defect claim." *Id.* at 992 (quoting *Roberts v. Rich Foods, Inc.*, 654 A.2d 1365, 1370 (N.J. 1995)) (internal alterations cleaned up). In Massachusetts, not only does the risk-utility analysis control, but also "the SJC [has] pronounced that 'there is a case' for design defect if a design modification would have reduced the risk without undue cost or interference, even where a product['s] . . . dangers are obvious." *Ducat*, 534 F. Supp. 3d at 158 (quoting *Uloth v. City Tank Corp.*, 384 N.E.2d 1188, 1193 (Mass. 1978)). In other words, in Massachusetts, unlike New Jersey, obvious danger is not an absolute defense.

Finally, in the recent decision in *Maywald v. Toyota Motor Corp.*, 591 P.3d 886 (Ariz. 2026), which DTNA brought to this court's attention in a reply brief, the Supreme Court of Arizona affirmed the trial court's entry of summary judgment in favor of the defendant car manufacturer. *Id.* at 895. The *Maywald* court held that the plaintiffs failed to make a threshold showing that the lack of a lane drift warning system was a defect, understood as a "condition or characteristic of the product not reasonably contemplated by the ordinary consumer that renders the product unsafe for its intended use." *Id.* at 893. The court reasoned that "consumers reasonably expect that vehicles are designed to allow them to drive within marked lanes, and . . . the [plaintiffs] failed to establish that the [subject vehicle] did not deliver on that expectation." *Id.* Because the plaintiffs failed to establish that the vehicle was "defective," the court ended its inquiry and did not consider whether it

was "more dangerous than a consumer would expect or whose risks outweigh its benefits." *Id.* at 892 (citing *Readenour v. Marion Power Shovel*, 719 P.2d 1058, 1063 (Ariz. 1986)). Massachusetts does not apply a reasonable consumer expectations test as a threshold for engaging in the risk-utility analysis.

Not only are the cases DTNA cites in support of its futility argument distinguishable factually or legally, but also Plaintiff has cited cases that support its counterargument that the question of whether the 2024 Freightliner Cascadia was unreasonably dangerous falls within the province of the jury. Most persuasively, Plaintiff cites another case brought against DTNA in Connecticut, in which DTNA was recently denied summary judgment. *Hunter v. DTNA*, No. UWYCV186040217S, 2024 WL 5008489, at *30 (Conn. Super. Ct. Aug. 8, 2024). The *Hunter* court reasoned that, "based on Connecticut product liability law, there remain general issues of material fact as to whether DTNA should have integrated as a standard feature the available [forward collision warning] and [collision mitigation] systems in [the subject] 2016 Freightliner Cascadia when assembled, as reasonable minds could conclude that such installation was less costly and risky than the foreseeability of harm caused by the failure to install those systems." *Id.* at *29. The court went on to explain that, in making the determination, "the factfinder must employ a multi-factor analysis to determine whether the [forward collision warning] or [collision mitigation] systems available when the 2016 Freightliner Cascadia was assembled were reasonable alternative designs that would have avoided or reduced the risk of harm that occurred here, resulting in the injuries of the plaintiff . . . , and

whether the absence of those systems in plaintiff['s] Freightliner Cascadia rendered the vehicle unreasonably dangerous." *Id.* This court agrees with Hunter that the question of whether the Freightliner Cascadia truck—in this case the 2024 model—was unreasonably dangerous requires factual determinations that belong to a jury, not the court.

Finally, the court is unpersuaded by DTNA's undeveloped argument that causation is too speculative to state a claim. Plaintiff has pled that the lack of any sort of collision mitigation system in the subject Freightliner Cascadia caused it to fail to adequately decelerate to avoid rear-ending the vehicle in which Garcia Franks was riding, or that her injuries could at least have been mitigated by inclusion of such a system in the heavy truck. DTNA cites no authority for the proposition that Plaintiff must have inspected the vehicles involved in the collision to plausibly state this theory of causation.

V. <u>Conclusion</u>

For the above stated reasons, Plaintiff's request for leave to add a Chapter 93A claim against DTNA is ALLOWED. Plaintiff is directed to file his third amended complaint in the form attached to his motion (Dkt. No. 122-3, although he may substitute "Third" for "Second" in the title), within ten days of this order.

Dated: November 6, 2026

/s/ Christopher L. Morgan
CHRISTOPHER L. MORGAN
United States Magistrate Judge